*36 Vroom.*                    Bullock v. State.

WILLIAM BULLOCK, PLAINTIFF IN ERROR, v. STATE OF
NEW JERSEY, DEFENDANT IN ERROR.

Argued July 2, 1900—Decided July 9, 1900.

1. A count in an indictment in the statutory form (*Pamph. L.* 1898,
   p. 879), charging that the accused "willfully, feloniously, deliber-
   ately and of his malice aforethought did kill and murder, contrary
   to the form of the statute," &c., is a sufficient indictment for
   killing an officer in the execution of his office. It is not necessary
   that it should contain an allegation that the deceased was an
   officer.

2. The court, on the application of the accused, made an order for a
   struck jury, and on the trial such jury, failing to agree, was dis-
   charged. Subsequently, on the application of the prosecutor, the
   court made an order that the rule for a struck jury should be
   discharged, and on the trial by a jury taken from the general
   panel the accused was convicted. *Held,* (1) that the statute vests
   in the court a discretion to order a struck jury and vacate such
   order when made, and (2) that the accused had no legal or vested
   right to a choice in the manner of convening the jury provided by
   law, and was not by the order of the court discharging the rule
   for a struck jury deprived of any right which could, in a legal
   sense, be considered either a "manifest wrong or injury," within
   the statute. *Pamph. L.* 1898, p. 915.

3. The accused was a colored man. A challenge to the array was
   made on the ground that there was no colored man returned on
   the panel, and that the accused was denied civil rights guaranteed
   to him by the constitution of the United States. This challenge
   was overruled. *Held,* (1) that this constitutional provision relates
   only to the state action, and was designed as a protection against
   acts of the state and not the acts of persons. The statute of this
   state regulating the selection and return of jurors does not restrict
   the class of persons who shall be liable to serve as jurors to white
   persons. Every citizen having the qualifications prescribed by the
   act is qualified to serve, without distinction as to color or race.
   (2) If the officer, in selecting the grand jury or the general panel
   of petit jurors, or in drawing a jury to try a colored man, excludes
   colored men, otherwise qualified, only because they are colored, the
   court will quash the indictment or panel, or reverse the conviction
   on error. But the absence of colored men from the panel of jurors
   returned to try a colored man is not error, in the absence of proof
   that such exclusion was done designedly and that colored persons
   qualified to serve were omitted otherwise than in the same way
   that white citizens not selected were omitted.

4. The killing of the deceased occurred in Red Bank on the 13th of
   November, about four o'clock in the afternoon. The accused fled
   and was arrested in South Amboy about half-past eleven the same

night by two policemen of South Amboy. After the two police-men had searched the prisoner and put him in jail one of them, in the presence of other officers, said to the prisoner that he had better tell all about it, and that it would be easier for him. It may be inferred from the testimony that a confession was made to these officers, but was not in evidence. Subsequently S., the chief of police of Red Bank, went to South Amboy at about four o'clock in the morning and saw the prisoner. An offer was made by the state of the confession made to this officer. The officer testified that he cautioned the prisoner not to say anything, and that after that the prisoner made a confession, which was received in evidence. After the examination of witnesses the court, under exception, permitted S. to testify to the confession made to him. The con-duct of this officer towards the prisoner was in all respects con-sistent with his duty. He was not a participant in the doings of the other officers or their associates, or cognizant of what they had done. *Held*, that when once a confession is obtained by im-proper influence, or improper influence has been used, a presump-tion arises that a subsequent confession is prompted by like in-fluence, and such presumption must be overcome before the con-fession is competent to be given in evidence ; but such presumption being satisfactorily overcome, the evidence should be received.

5. Whether the confession that was received in evidence was made when the mind of the prisoner was laboring under or was free from the effect of the previous conduct of the officers, was a ques-tion of fact for the trial court. In deciding upon that proposition, any antecedent hopes or fears that might have been engendered by the acts of the other officers are to be brought into account by the court in the first instance, and by the jury subsequently, and weighed as part of the evidence on the question whether the sub-sequent confession was or was not voluntary.

6. The finding of the trial court on the question of fact will not be set aside, unless the evidence upon its face does not support the conclusion upon which the trial court based its judgment.

7. The deceased was one of the constables of the county of M. On the day in question he went to the residence of the accused with a writ of execution upon a judgment recovered against the accused at the suit of one A., and also a warrant issued by a justice of the peace upon a complaint made by one J. E. S., charging the prisoner with malicious mischief. These writs were issued by a justice of the peace of the county of M. The prisoner knew that the deceased was a constable and was made aware of the object of his visit on that day. By statute, the killing of any magistrate, sheriff, coroner, constable or other officer of justice, either civil or criminal, in the execution of his office or duty, is declared to be murder. *Pamph. L.* 1898, *p.* 824.

8. The deceased was elected constable in the spring of 1897 for a term of three years. The statute requires constables to renew their official bonds annually, and provides that if a constable should neglect or refuse so to do within thirty days after the expiration of each yearly term, his position should become vacant,

and such vacancy should be filled as required by law. *Pamph. L.* 1899, *p.* 429. The deceased took the oath of office and gave bond as constable in March, 1897. In 1898 he omitted to renew his bond, but in March, 1899, he filed a bond which complied with the statute. This bond was accepted by the township officers. The continuance of the deceased in office was recognized by the public authorities, and his official character was shown by such evidence as is uniformly regarded as sufficient proof of official position. The Court of Oyer and Terminer on this proceeding had no authority to institute an inquiry as to whether his office had become vacant and pronounce a judgment of forfeiture. The deceased, at the time he was killed, was in the execution of the duties of the office of constable.

9. The accused sought to justify the killing on the ground that it was done in self-defence. Ministers of justice, while in the execution of their offices, are under the peculiar protection of the law. This special protection is founded in great wisdom and in every principle of political justice; for without it the public tranquility cannot possibly be maintained or private property secured. For these reasons the killing of officers so employed has been deemed, at common law, murder of malice prepense, as being in defiance of the justice of the kingdom. To the same effect is the statute of this state.

10. It is said that where an officer, in executing his office proceeds irregularly and exceeds the limits of his authority, the law gives him no protection in that excess, and if he be killed the offence will amount to no more than manslaughter in the person whose liberty is so invaded. But what is meant by proceeding irregularly or exceeding the limits of his authority concerns the validity and character of the process in the hands of the officer.

11. Testimony complaining of oppressive conduct on the part of the complainant and plaintiff in the cases in which the writs in the hands of the deceased had been issued was incompetent. In the service of criminal process an officer is not to be influenced or governed by the purposes, designs or objects of complainants, but by his precept; and if the process be regular and legal on its face, and within the jurisdiction of the magistrate to issue, the officer will be protected in its service, and if he be killed in the execution of it the offence will be murder.

12. Upon an indictment for killing an officer while attempting to serve process, the production of the warrant or writ is all that is required, and the prior proceedings cannot be investigated.

13. The instruction of the court that the accused, if convicted, should be convicted of murder was correct. The statute makes the killing of an officer in the execution of his duty murder. Whether it should be murder of the first or second degree will depend upon the circumstances of the killing.

14. On the trial the accused was a witness and was asked if he had ever had any trouble with anyone, and answered that he never had. On cross-examination he was asked if he did not have a dispute with one C., and draw a razor on him. *Held*, that this

evidence was incompetent, but if at all competent on cross-examination, being irrelevant and immaterial, the state was bound by the answer of the accused and could not contradict it.

15. C. was called as a witness by the state and testified that about eighteen years prior the prisoner had worked for him, and in a dispute had come at the witness with a razor, &c. *Held*, that this testimony was incompetent.

16. On the trial of an accused for a crime it is not competent to prove that he committed other crimes of like nature for the purpose of showing that the accused would be likely to commit the crime charged in the indictment.

17. Where evidence which is illegal is received by the court in the progress of the trial, it is competent for the court subsequently to exclude such illegal testimony. In such a case no error could be assigned on the reception of the testimony. But the admission of the evidence being error, it must clearly appear that the testimony illegally admitted was so eradicated from the case that its admission could not have injuriously affected the accused.

18. Nor was the testimony of C. competent or relevant on the issue of the character of the accused. If a prisoner on his trial gives evidence that his character is good, it is open for the prosecution, by way of reply, to prove that the prisoner's character is bad ; but evidence of this character must be confined to general reputation, and particular acts or specific facts are not admissible as original evidence or as evidence by way of rebuttal.

On error to the Court of Oyer and Terminer of the county of Monmouth.

The plaintiff in error was indicted for murder in causing the death of James Walsh, a constable of the county of Monmouth, on November 13th, 1899. At the trial he was convicted of murder of the first degree and sentenced to death. Thereupon he sued out this writ of error.

For the plaintiff in error, *George C. Beekman* and *William J. Leonard*.

For the defendant in error, *John E. Foster*, prosecutor of the pleas.

The opinion of the court was delivered by

DEPUE, CHIEF JUSTICE. The first assignment of error is directed to the form of the indictment. The indictment con-

tains two counts: First, a count in the statutory form prescribed by the forty-fifth section of the act regulating proceedings in criminal cases. *Rev., p.* 275; *Pamph L.* 1898, *p.* 879, § 36. In this count the statutory language was followed, charging that the accused "willfully, feloniously, deliberately and of his malice aforethought did kill and murder, contrary to the form of the statute in such case made and provided," &c. This form of indictment has been held to be sufficient to charge the crime of murder in the first degree. *Graves* v. *State,* 16 *Vroom* 203, 347. The second count charges that the accused did "willfully and feloniously kill one James Walsh, he then and there being one of the constables of the said county, and then and there being in the execution of his office and duties as such constable." An indictment in the statutory form prescribed by section 45 of the Criminal Procedure act (*Rev., p.* 275; *Pamph. L.* 1898, *p.* 879, § 36) is a sufficient indictment for the killing of an officer in the execution of his office, and it is not necessary that the indictment should contain an allegation that the deceased was an officer. *Brown* v. *State,* 33 *Vroom* 666. The criticism on the second count is purely formal. Either count is sufficient to sustain the present conviction.

The indictment was found in the Court of Oyer and Terminer of the county of Monmouth, and set down for trial at the term of January, 1900. On the 20th of February, as yet of that term, on the application of the prisoner, the court made an order that a jury be struck for the trial of the indictment at the then present term of the court. In pursuance of this order a jury was struck, and the accused was placed on trial before such jury, and the jury, failing to agree, was discharged by the court. Afterwards, at the May Term, the court, on the application of the prosecutor, upon due notice to the counsel of the accused, ordered that the rule for a struck jury be vacated. To this order the counsel of the accused excepted, and the case was tried by a jury taken from the general panel summoned for service at that term of the court. By section 18 of the act concerning juries (*Rev., p.* 527) it was enacted that the Supreme Court, the Circuit Courts,

the Courts of Common Pleas, Court of Oyer and Terminer, and the Courts of General Quarter Sessions of the Peace, respectively, may, on motion in behalf of the state, or of any prosecutor or defendant in any indictment or information in the nature of a *quo warranto,* or on motion in behalf of the state, or of any plaintiff or defendant, in any action triable by a jury, order a jury to be struck for the trial thereof, &c. Section 19 provides that "If a rule for a struck jury shall be entered in any cause it shall remain in force, until the cause shall be tried, and no common jury shall be summoned therein, unless the said rule shall be first vacated by the court," &c. These statutory provisions vest in the court a discretion to order a struck jury and to vacate such an order when it has been made. A party in either a civil or criminal case has no vested or legal right to chóose which of the two methods provided at law for the selection of juries for the trial of a civil or criminal case shall be adopted by the court, and therefore has no ground of exception to the order of the court for the selection of jurors in a manner provided by law. Having no legal or vested right to a choice in the manner of convening the jury provided by law, the prisoner was not, by the order of the court discharging the rule for a struck jury, deprived of any right which could, in a legal sense, be considered either a "manifest wrong or injury" within the purview of section 136 of the act of 1898. *Pamph. L., p.* 915.

The accused is a colored man. On the return of the panel of jurors, the defendant's counsel challenged the array on the ground that there was no colored man returned on the panel. This challenge was overruled, and an exception taken. The contention of the counsel of the plaintiff in error in support of this exception was that the accused had been denied civil rights guaranteed to him by the fourteenth amendment to the constitution of the United States. The language of that amendment pertinent to this subject is contained in section 1, as follows: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life,

liberty or property without due process of law, nor deny to
any person within its jurisdiction the equal protection of the
laws." This provision relates to state action exclusively, and
was designed as a protection against acts of the state and
not the acts of persons. *Paul* v. *Virginia,* 8 *Wall.* 168;
*Slaughter-house Cases,* 16 *Id.* 36; *United States* v. *Harris,*
16 *Otto* 629; *Strauder* v. *West Virginia,* 10 *Id.* 303, 312;
*Virginia* v. *Rives, Id.* 313, 339; *Gibson* v. *Mississippi,* 162
*U. S.* 565; *Neal* v. *Delaware,* 103 *Id.* 370, 391. A statute
of the state which restricts the class of citizens who shall be
liable to serve as jurors to white persons would be a violation
by the state of this constitutional provision. The statute
of this state in relation to juries is not open to such an
objection. The qualification of jurors, grand or petit, pre-
scribed by the statute is that every juror shall be a citizen of
this state and resident in the county from which he shall be
taken, and above the age of twenty-one and under the age of
sixty-five; and the sheriff is required to select as the panel
of jurors for the trial of cases, civil and criminal, from the
persons qualified to serve as jurors the names of at least
twice as many persons as he shall deem necessary to be
summoned as jurors. *Rev., pp.* 532, 533. "If the subordi-
nate officer whose duty it is to select jurors fails to discharge
that duty in the true spirit of the law; if he excludes all
colored men solely because they are colored; if the sheriff to
whom a venire is given, composed of both white and colored
citizens, neglects to summon the colored jurors only because
they are colored; or if a clerk whose duty it is to take the
twelve names from the box rejects all the colored jurors for
the same reason," as was said by Mr. Justice Strong, in
Virginia *v.* Rives, "it can with no propriety be said that the
defendant's right is denied by the state and cannot be en-
forced in the judicial tribunals. The court will correct the
wrong, will quash the indictment or the panel, or, if not,
the error will be corrected in a superior court. * * * The
assertions in the petition for removal, that the grand jury
by which the petitioners were indicted, as well as the jury
summoned to try them, were composed wholly of the white

race, and that their race had never been allowed to serve as jurors in the county in any case in which a colored man was interested, fall short of showing that any civil right was denied, or that there had been any discrimination against the defendants because of their color or race. The facts may have been as stated, and yet the jury which indicted them, and the panel summoned to try them, may have been impartially selected." In *Johnson* v. *State,* 30 *Vroom* 271, 536, 540, a colored man was indicted for murder. Error was assigned in the exclusion of negroes from jury duty. Nothing appeared except that no colored men were returned on the panel of jurors. It was held by the Supreme Court and by this court that upon the trial of a colored man the absence of negroes from the panel of jurors is not error in the absence of proof that this exclusion was done designedly, or that such persons were omitted otherwise than in the same way that white citizens not selected were omitted.

There were no colored men returned on this panel of jurors; but the evidence falls far short of showing that they were designedly excluded on account of color by the sheriff in making up his jury list.

Another exception was directed to the admission in evidence of a confession by the prisoner. The killing of the deceased occurred on the 13th of November, about four o'clock in the afternoon. The accused immediately fled, and was arrested at South Amboy, about half-past eleven o'clock the same night, by William McDonald, a policeman at South Amboy. It appears from the testimony of McDonald that after he, in connection with Officer Menagh, of South Amboy, had searched the prisoner and put him in jail, either Menagh or his son said to the prisoner, in the presence of those officers, that he had better tell all about it, and that it would be easier for him. McDonald said: "That is the way they worked it on him." A confession procured under such circumstances would be clearly incompetent as evidence; but no confession made to either of these officers was put in evidence. Their conduct in this respect was reprehensible, but is important only in its effect upon what occurred subsequently.

Stryker, the .chief of police of Red Bank, went to South Amboy to arrest the prisoner. He arrived at the lockup at South Amboy about four o'clock in the morning. He hunted up the South Amboy officers, and with them went to the town hall. An offer was made on behalf of the state of the confession made by the prisoner to this witness. On the preliminary examination to ascertain the competency of such ·evidence the witness testified: "As soon as we got to the foot of the stairs leading down to the cell in the lockup Mr. Bullock jumped up and came to the cell door, and he says, 'Stryker,' or 'chief,' something of that kind, 'I am glad you have come; I am glad to see you;' and he immediately commenced to talk about what had happened, and· I told him· right away, I said, 'William, you need not say a word about this unless you are a mind to, and if you do .it will be used .against you on the trial;' and he says, 'Well, I might as well tell about it; it is all over; I shot him;' and then he commenced to tell about how it all happened." On the cross-examination of this witness he testified that he did not know that the prisoner had already made a confession; that he warned him not to talk, because he thought it was the officer's duty to give such warning; he always did it. The prisoner was also examined as a witness on this preliminary examination, ·and testified to what McDonald had said to him. It will be ·observed that Stryker was not present at any part of the interview between the prisoner and McDonald. The prisoner testified that when Stryker came to the cell he said, "Don't talk, don't talk, don't· talk; don't say a word, don't say a word; you are not bound to say a word unless you want to; you are not compelled to say one word unless you want to." And then the prisoner said, "I went to talking to him about ·some papers that I got him to collect, and he said, 'That has nothing to do with your shooting Walsh.' " After the examination of witnesses on this preliminary examination, the ·court, under exception, permitted Stryker to testify to the ·confession made to him by the prisoner.

A confession made by a prisoner charged with crime, to .an officer in whose custody he is upon that charge can be

received in evidence only when it appears that the confession was voluntary. By this is meant that the confession must not be extorted by threats or obtained by any direct or implied promise relating to some benefit to be derived by the prisoner in the criminal prosecution. The ground on which a confession made by the accused under promise of favor or threats of injury is excluded as incompetent is not because any wrong is done to the accused in using them, but because he may be induced by the pressure of hope or fear to admit facts unfavorable to him without regard to their truth. *Roesel* v. *State,* 33 *Vroom* 216.

Stryker's conduct towards the prisoner was in all respects consistent with his duty. He was in no way a participant in the doings of McDonald, Menagh and their associates, or cognizant of what they had done. If the competency of the confession made to Stryker rested only on his conduct towards the prisoner, the confession would undoubtedly have been competent. The question is whether a confession made to him could be received in evidence as a voluntary confession after what had previously occurred between the other officers and the prisoner. It is well settled that where promises or threats have been once used, of such a nature as to render a confession inadmissible, all subsequent admissions of the same or like facts will be rejected, unless from the length of time intervening, from proper warning of the consequences, or from other circumstances, there be good reason to presume that the delusive hope or fear that influenced the first confession has been effectually dispelled. Where, however, it appears to the satisfaction of the judge that the improper influence was totally done away before the confession was made, the evidence will be received. 1 *Tayl. Ev.,* § 878; *State* v. *Guild,* 5 *Halst.* 163, 179, 180. In the case last cited Chief Justice Ewing, commenting on the doctrine laid down by Mr. Starkie, that where a confession has once been induced by threats or promises, all subsequent admissions of the same or of the like facts must be rejected, for they may have resulted from the same influence, says that the reason given for the rule by Mr. Starkie, that the subsequent

admissions may have resulted from the antecedent influence, is unsound. He adds: "In all sound logic the question must turn, not on the possibility, but the presence of influence; not whether influence once existed, but whether it continued to exert its force. * * * It follows that the true criterion is the actual state of mind of the accused at the time the confessions were made, and the true question for solution, whether, at that time, he was under undue influence of hope or fear. It is readily admitted that the antecedent hopes or fears, or other sources of influence, are to be brought into account and weighed. It may even be conceded that when once a confession under influence is obtained, a presumption arises that a subsequent confession of the same nature flows from the like influence, and that such presumption should be overcome before the confession ought to be given in evidence. But such presumption being satisfactorily repelled, the evidence ought to be received. The rule stated by Starkie, as it goes further, is erroneous." Whether the confession that was received in evidence was made when the mind of the prisoner was laboring under, or was free from, the effect of the previous conduct of McDonald and his associates, presented a question of fact for the trial court. The finding of the trial court on the question of fact will not be set aside unless the evidence on its face does not support the conclusion upon which the trial court based its judgment. *State* v. *Roesel, supra.* We think the testimony of Stryker and of the prisoner himself, with respect to what occurred between them before any confession was made to Stryker, was sufficient to justify the court in its finding that that confession was the voluntary act of the accused.

But where, notwithstanding the finding of the court, there may be a doubt from the whole evidence whether the confession was or was not the voluntary act of the accused, the question should be left to the jury, with a direction that they should reject it if, upon the whole evidence, they were satisfied that it was not his voluntary act. *Roesel* v. *State, supra.* The learned judge considered that it was the duty of the court to submit such a question to the jury, for he

expressly instructed the jury that they must be satisfied that the confession of guilt was the voluntary act of the accused, and not induced by threat, promise or deception. The court should also have called the attention of the jury upon this subject to the conduct of the officers who had the accused in charge before Stryker came, and the jury should have considered that evidence in connection with the testimony of Stryker on which to determine whether the confession made to the latter officer was the voluntary act of the accused. In deciding upon that proposition any antecedent hopes or fears that might have been engendered by the acts of the other officers were to be brought into account by the court in the first instance, and by the jury subsequently, and weighed as part of the evidence on the question whether the confession to Stryker was or was not voluntary. No exception was taken to the manner in which this subject was submitted to the jury by the trial court.

The deceased was one of the constables of the county of Monmouth. On the day in question he went to the residence of the prisoner with a writ of execution to him directed, issued by a justice of the peace upon a judgment recovered against the prisoner at the suit of Robert Allen, Jr. He had also a warrant issued by a justice of the peace upon a complaint made by one John E. Stillwell, charging that the prisoner, with force and arms, willfully, maliciously and designedly cut and destroyed the cushions, curtains and spokes of a wagon owned by said Stillwell. This warrant authorized and required the officer to apprehend the prisoner and bring him before the justice issuing the warrant, or some other justice of the peace of said county, to answer to the said complaint. The purpose of the deceased in going to the residence of the prisoner was to execute these writs, the one by a levy on the prisoner's property, the other by taking his person. The prisoner knew that Walsh was a constable, and he was made aware of the object of his visit on that day. By the statute the killing of any magistrate, sheriff, coroner, constable or other officer of justice, either civil or criminal, in the execution of his office or duty, is

declared to be murder. *Pamph. L.* 1898, *p.* 824, § 106. The deceased was elected constable in the spring of 1897. His term of office was for three years. By statute constables were required to renew their official bonds annually, and it was provided that if a constable should neglect or refuse so to do within thirty days after the expiration of each yearly term his position should become vacant, and such vacancy should be filled as required by law. *Gen. Slat., p.* 849, §§ 14, 16; *Pamph. L.* 1899, *p.* 429. The deceased took the oath of office and gave a bond as constable in March, 1897. In 1898 he omitted to renew his bond, but in March, 1899, he filed a renewal bond, which complied with the statute. These bonds were accepted by the township officers. It is contended that the deceased, having failed to renew his bond in 1898, his office as constable became vacated, and could not be restored to him by giving a bond in 1899. The constitution of this state provides that sheriffs and coroners shall hold their offices for three years, and that sheriffs should annually renew their bonds. By statute the sheriff-elect or the sheriff for the time being is required to enter into bond on the first Tuesday after the annual election of members of General Assembly, with sufficient sureties and in such sum as the Court of Common Pleas might order, &c. It also provides "that if any sheriff for the time being of any county shall neglect, refuse or be unable to give bond with sureties as aforesaid, agreeably to the directions of this act, at the time therein limited, the office of such sheriff shall immediately expire and be deemed and taken to be vacant, and if such sheriff shall thereafter presume to execute the office of sheriff, then all such his acts and proceedings done under color of office shall be absolutely void, and he shall for such offence be liable to be indicted for a misdemeanor," &c. The Supreme Court held that this legislation did not *per se* vacate the office of the sheriff on his failure to renew his bond within the specified time, and that such sheriff was an officer with a defeasible title until the judgment of forfeiture was pronounced in due form. *Gen. Stat., p.* 3112; *Clark* v. *Ennis,* 16 *Vroom* 69. The term for which the deceased was

elected constable was three years. His continuance in office was recognized by the public authorities, and his official character was shown by such evidence as is uniformly regarded as sufficient proof of official position. The Court of Oyer and Terminer, on this issue, had no authority to institute an inquiry as to whether his office had become vacant and pronounce a judgment of forfeiture.

It is contended by the plaintiff in error that, notwithstanding the deceased was an officer and was killed while in the execution of the duties of his office, and although the statute prescribes that the killing of such officer, under those circumstances, is murder, yet that, under the facts disclosed in this case, the accused should have been convicted only of manslaughter. The prisoner also sought to justify the killing on the ground that it was done in self-defence. The learned judge, in his instructions to the jury, declared his opinion that under no view of any evidence in the cause could the killing have been merely manslaughter.

"Ministers of justice while in the execution of their offices are under the peculiar protection of the law. This special protection is founded in great wisdom and equity, and in every principle of political justice; for without it, the public tranquility cannot possibly be maintained, or private property secured; nor, in the ordinary course of things, will offenders of any kind be amenable to justice. And for these reasons the killing of officers so employed hath been deemed murder of malice prepense, as being an outrage willfully committed in defiance of the justice of the kingdom." *Fost. C. L.* 308; *Mackalley's Case,* 9 *Coke* 65. By statute the killing of an officer of justice in the execution of his office or duty is made murder, which will be murder of the first or second degree, according to circumstances.

Where an officer, in executing his office, proceeds irregularly, and exceeds the limits of his authority, the law gives him no protection in that excess, and if he be killed, the offence will amount to no more than manslaughter in the person whose liberty is so invaded. 3 *Russ. Cr.* 109. But it will be observed on an examination of the authorities that

what is meant by proceeding irregularly or exceeding the limits of his authority concerns the validity and character of the process in the hands of the officer. Mr. Russell adds that the officer should be careful, therefore, to execute process only within the jurisdiction of the court from whence it issues, and if it be executed out of such jurisdiction the killing of the officer attempting to execute it will be only manslaughter. * * * The officer must also be careful not to make the arrest on a Sunday, except in cases of treason, felony or breach of the peace, as in all other cases an arrest on that day will be the same as if done without authority. *Id.* To the same effect was the instruction of Mr. Justice Lippincott to the jury in the case of State *v.* Brown, which was an indictment for killing an officer in the execution of his duties, and that instruction was approved by this court. *Brown* v. *State,* 33 *Vroom* 666, 713, 714.

Testimony was given by the prisoner complaining of oppressive conduct on the part of Allen and of Stillwell; that the latter had previously procured the search of his premises without justification. This evidence was incompetent. In the service of criminal process an officer is not to be influenced or governed by the purposes, designs or objects of complainants, but by his precept; and if the process be regular and legal upon its face, and within the jurisdiction of the magistrate to issue, the officer will be protected in its service, and if he be killed in the execution of it this will be murder, although the complainant had illegal designs in causing it to be issued, and although the officer knew that the warrant had been procured by the complainant to accomplish improper and illegal objects. *State* v. *Weed,* 1 *Fost.* 262; 1 *Lead. Cr. Cas.* 202; 7 *Bac. Abr.* 198, *tit. "Murder and Homicide;" Fost. C. L.* 136, 312. Upon an indictment for killing an officer while attempting to serve process the production of the warrant or writ is all that is required, and the prior proceedings cannot be investigated. *Rosc. Cr. Ev.* 790, 791; 1 *East P. C.* 309, § 78. The controversy of Allen and Stillwell with the prisoner and their treatment of him were

matters that did not concern the deceased; it was his duty to execute the writ.

The process in the hands of the deceased for the arrest of the prisoner was issued by competent authority, and was in all respects regular on its face. The deceased was in the act of executing the process by arresting the prisoner within the jurisdiction of the magistrate by whom it was issued. He was killed when he was "in the execution of his office or duty." If the act of killing be not excused or justified, so as to entitle the accused to an acquittal, the conviction must be of murder; for the statute expressly declares that if any person shall kill any of the officers of justice named "in the execution of his office or duty, then such person or persons so killing as aforesaid shall be guilty of murder." If the act of killing be justified, then an accused would be entitled to an acquittal. The accused sought to justify the act of killing on the ground of self-defence.

In disposing of the justification set up for the killing of the deceased, the primary consideration concerns the rights and duties of the parties respectively. It was the duty of the deceased to execute his process by taking the body of the accused into custody and to hold him in custody to answer the command of the writ, and it was the duty of the accused to submit to such arrest and custody. If, in making an arrest, the officer meets with resistance he is not obliged to retreat or desist. Judge Foster states the doctrine as to arrests in cases of misdemeanors and breaches of the peace, as well as in cases of felonies, in these words: "The person having authority to arrest or imprison may repel force with force, and if death ensueth in the struggle he will be justified. This is founded in reason and public utility. For few men woud quietly submit to an arrest if in every case of resistance the party empowered to arrest was obliged to desist and leave the business undone." *Fost.* 270, § 2; 1 *Hale P. C.* 481. "If the officer meet with resistance and kill the offender in the struggle he will be justified, and if he be killed it will be murder." 1 *East* 302, *c.* 5, § 70; 2 *Rosc. Cr. Ev.* 299; 3 *Russ. Cr.* 73. It must not, however, be assumed that an officer

in the execution of process would be protected in acts of violence upon the prisoner committed of his own wrong and not warranted in the performance of his duty. The conditions under which an officer is deprived of the protection of his process are those in which in executing it he, of his own wrong, commits acts of violence against the accused which are not justified in the execution of his process  Under such circumstances a right of self-defence by the accused may arise.  If in any case it be made to appear that the occasion for self-defence on the part of an accused has arisen, then the question will be whether that defence has been entered upon and conducted in accordance with the law as laid down in Brown *v.* State.  Even if the prisoner had a right of self-defence, it would not follow that he would be entitled to an acquittal.  Under such circumstances the problem for solution, upon which the result of the trial would be determined, would be whether the act of killing the officer was done in the lawful exercise of that right of self-defence.  The prisoner fired five shots from his pistol in rapid succession, three of which took effect upon the body of the deceased, causing instant death.  This is the act done by the prisoner which must be justified in order to an acquittal.  Whether the prisoner was justified in resorting to self-defence at all, and whether the acts done by him were lawful in the prosecution of his defence, must be determined by the legal principles adjudicated in Brown *v.* State.

It is not proposed to discuss the evidence on this subject. The prisoner was a competent witness in his own behalf; but in giving effect to his testimony the jury should have been reminded of the momentous interest he had in the result of the trial as affecting his credibility.

The instruction of the trial court in presenting the case, on the theory that the accused, if convicted, should be convicted of murder, was correct.  The argument of counsel based upon the omission of the words "and be thereof convicted" in the re-enactment of section 70 (*Rev.,* p. 239) in the act of 1898 (*p.* 825, § 109) does not require consideration.  The statute prescribes the penalty for murder of the

first degree and for murder of the second degree, and on a conviction by the jury of an offence of either class the statute fixes the sentence to be pronounced.

Thus far in the examination of the record in this case no exception taken by the accused is found that would call for a reversal.

I now come to the exception taken to the admission of testimony given by Peter B. Campbell. Campbell testified that when the prisoner was a boy of seventeen or eighteen years of age he worked for him for a few days. (The prisoner was thirty-six at the time of the trial.) He further testified: "He worked for me three or four days, and he didn't come back to his work and I done it myself, and he came in the stall and wanted to know what I was doing in there; I told him I had a right in there, and he wanted me to go out, and I didn't go, and he pulled the door and came at me with a razor, and I struck him with a fork and broke two of his teeth off in front, and he has got them there yet—that is, just a little scale off; and he came at me a second time, and I knocked him down, and a man came in and picked up the razor." Then, as appears by the record, the prisoner opened his mouth so that the jury might look at his teeth, and it appeared that one tooth in the lower jaw was missing. The witness then testified that he did not remember whether he broke one or two teeth, but he knew it was on one side or the other of his mouth. The prisoner was called to rebut this testimony, and testified that he never worked for Campbell in his life, and also as to the manner in which he lost the tooth from the lower part of his jaw. Campbell's testimony was received under exception. It was clearly incompetent. On the trial of an accused for a crime it is not competent to prove that he committed other crimes of a like nature for the purpose of showing that the accused would be likely to commit the crime charged in the indictment. *Clark* v. *State,* 18 *Vroom* 556; *Leonard* v. *State,* 31 *Id.* 8; *State* v. *Raymond,* 24 *Id.* 260, 265; *Meyer* v. *State,* 30 *Id.* 310; *Parks* v. *State. Id.* 573; *Ryan* v. *State,* 31 *Id.* 552, 556; *State* v. *Sprague,* 35 *Vroom* 419. There is a class of cases in which the knowl-

edge, good faith, motive or intent of a party is material, on
which evidence collateral to the main subject is sometimes
admitted; but the competency of such evidence is limited to
facts which are so connected with the subject in controversy
as to make it apparent that the party had a common purpose
in both transactions. 1 *Tayl. Ev.,* §§ 327, 338, 348; 11
*Am. & Eng. Encycl. L. (2d ed.)* 510, 514 and cases cited in
the notes; *Jordan* v. *Osgood,* 109 *Mass.* 457, 463; *Cary* v.
*Hotailing,* 1 *Hill* 311, 316; *People* v. *Dimick,* 107 *N. Y.*
13, 32; *King* v. *Ellis,* 6 *Barn. & C.* 145. But on the trial of a
criminal charge it is not relevant to show that the defendant
has committed other similar crimes which are not connected
in any way with the one in question. 11 *Am. & Eng. Encycl.
L. (2d ed.)* 513; *Boyd* v. *United States,* 142 *U. S.* 450; *Com-
monwealth* v. *Jackson,* 132 *Mass.* 16; *People* v. *Gibbs,* 93 *N.
Y.* 470, 473. The transaction testified to by Campbell was
wholly extraneous and had no connection whatever with the
charge for which the prisoner was on trial.

The only argument presented by the counsel of the state
in support of the legality of the evidence of Campbell was
that it was made competent by the cross-examination of the
accused. On the examination of the accused by his counsel
he was asked the question whether he had ever had trouble
with anyone, to which he answered that he had never had
trouble with anyone. On cross-examination counsel of the
state asked him whether he did not have a dispute with Camp-
bell, and draw a razor on him in the stall and attack him
with a pitchfork. Objection was taken to this testimony, and
the objection was overruled. This evidence was incompetent,
but if at all competent on cross-examination, being irrelevant
and immaterial, the state was bound by the answer of the
witness, and it laid no foundation for the right to contradict
him in that respect by the testimony of Campbell. *State* v.
*Sprague, supra; Bergen Neck Railway Co.* v. *Point Breeze
Ferry Co.,* 28 *Vroom* 163.

Where evidence which is illegal is received by the court in
the progress of the trial, it is competent for the court subse-
quently to exclude such illegal testimony. In such a case no

error could be assigned on the reception of the testimony. But the admission of the evidence being error, it must clearly appear that the testimony illegally admitted was so eradicated from the case that its admission could not have injuriously affected the accused. *Throckmorton* v. *Holt,* 180 *U. S.* 552, 567. The manner in which the evidence of Campbell was put in and the character of his testimony were calculated to impress upon the minds of the jurors a conviction of the natural propensity of the prisoner to resort to extreme violence on slight provocation. To have removed the effect of this evidence it would, at least, have been necessary to have expunged it from the record formally and emphatically before the testimony was closed and the summing up of counsel was commenced. No order overruling the testimony was made, and it may be assumed that it was commented upon by counsel in their arguments before the jury. In the course of the delivery of the charge the judge, adverting to this testimony, used this language: "I will digress to say a word about some testimony introduced in the case, tending to show violence on his (the prisoner's) part on other occasions. I had some hesitation in admitting the testimony of the witness Campbell, but I judged it to be legal, because of the prisoner's own statement that he had never had any trouble before this. On reflection, after considering the evidence of Campbell, I think it is my duty to tell you to disregard that, because it seems to me too uncertain on the question of identity to be of value. It would not be evidential simply to overcome proof of reputation." It will be observed from this language that in the charge the judge did not instruct the jury to disregard the evidence because it was illegal, but because it was too uncertain on the question of identity to be of value. It is quite possible that in the minds of the jurors the question of identity may have been established. We think that, notwithstanding the charge of the judge on this subject, the evidence of Campbell may have had, and probably did have, an influence on the minds of the jury in rendering its verdict.

Nor was the testimony of Campbell competent or relevant

on the issue of the character of the accused. If a prisoner, on his trial, gives evidence that his character is good, it is open for the prosecutor by way of reply to prove that the prisoner's character is bad; but, evidence of this character must be confined to general reputation, and particular acts or specific facts are not admissible, either as original evidence or as evidence by way of rebuttal. 5 *Am. & Eng. Encycl. L.* (*2d ed.*) 875 and cases cited in notes. Where a person accused of a criminal offence produces evidence to show that his general reputation is good, it is not competent for the government in reply to put in evidence particular facts. *Commonwealth* v. *O'Brien,* 119 *Mass.* 342; *Commonwealth* v. *Hardy,* 2 *Id.* 317; *Regina* v. *Rowton,* 10 *Cox C. C.* 25; *S. C.,* 2 *Lead. Cr. Cas.* 333; 3 *Russ. Cr.* 426.

For the admission of the testimony of Campbell we think the judgment should be reversed.

*For affirmance*—None.

*For reversal*—THE CHANCELLOR, CHIEF JUSTICE, VAN SYCKEL, DIXON, GARRISON, GUMMERE, LUDLOW, FORT, BOGERT, HENDRICKSON, ADAMS, VREDENBURGH, VOORHEES. 13.