David Leon TAYLOR, Appellant,

v.

UNITED STATES, Appellee.

No. 10963.

District of Columbia Court of Appeals.

Submitted Oct. 11, 1977.

Decided Nov. 30, 1977.

Joseph J. Bernard, Washington, D. C., appointed by this court, for appellant.

Earl J. Silbert, U. S. Atty., Washington, D. C., with whom John A. Terry, William D. Pease, Tobey W. Kaczensky and Neil I. Levy, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before KERN, GALLAGHER and MACK, Associate Judges.

KERN, Associate Judge:

A jury found appellant guilty of assault with intent to kill while armed (D.C.Code 1973, §§ 22–501, –3202), assault with intent to commit robbery while armed (D.C.Code 1973, §§ 22–501, –3202), and two counts of assault with a dangerous weapon (D.C.Code 1973, § 22–502).[1] On appeal, he argues that the trial court erred (a) in denying his motion to suppress a written incriminatory statement taken following the arrest, and (b) in declining to give a defense-requested instruction to the jury on "defense of another." We disagree and affirm the convictions.

I

This case arose from the attempted robbery of two employees of the Safeway Store in the Waterside Mall shopping complex at Fourth and M Streets, S.W., on the evening of June 16, 1975, as the men were taking the store's daily proceeds to an after-hours depository at a nearby bank. Appellant, who was seventeen years old, testified that he and a companion, Gerald Edwards, went to the mall with the intent of robbing these men. However, contrary to the store's normal procedure, on this night the two Safeway employees were joined by Michael Worthy, a uniformed security guard for the mall. Accordingly to appellant's testimony, when he saw the guard, he decided against the venture and told Edwards:

Let's not do it because they got a guard with them. One of us might get hurt real bad, or get killed.

Appellant Taylor then walked past the Safeway employees and the guard, proceeding in the direction of his home. Edwards, however, lagged behind and told the men, "This is a stick-up." Although there was conflicting testimony concerning subsequent events, it is clear that there was an exchange of gunfire between Edwards and the security guard and at some point during this exchange, Edwards was shot by the guard.[2] Appellant then began firing at the

---

1. The jury did not consider lesser included charges of assault with intent to commit robbery (D.C.Code 1973, § 22–501), and assault with intent to kill (D.C.Code 1973, § 22–501), nor did it consider an additional count of assault with a dangerous weapon (D.C.Code 1973, § 22–502), in which the victim was the same as in offenses for which appellant was found guilty. A charge of carrying a pistol without a license (D.C.Code 1973, § 22–3204) was dismissed at the close of the government's case.

2. Appellant testified that after Edwards announced his intention to rob, he had difficulty in extracting the gun from his pants. The security guard immediately drew his gun and fired on Edwards until the guard's gun was empty continuing to fire even after Edwards had slumped to the ground. On the contrary, the Safeway employees and the security guard testified that Edwards was the first to shoot and none of them saw Edwards fall to the ground, although one Safeway employee did see Edwards crouch over as though he had

guard, who was shot as he ran from the area.

After the gun battle ended, appellant assisted Edwards to leave the area and drove him to the emergency room of the Howard University Hospital. All hospitals were checked by the police for gunshot victims, and appellant was confronted and questioned by Detective James Pawlik. The detective first explained to Taylor that although he was not at that time under arrest, he was suspected of being implicated in a robbery, and therefore he had the right to remain silent.[3] Appellant denied any involvement in the robbery, stating that he had been flagged down by the injured man, whom he did not know. Subsequently, appellant was questioned by Detective Willie Jefferson, Jr., from the Robbery Branch, and he repeated the same story that he had told Pawlik.

Soon thereafter, based on a show-up identification at the hospital by the two Safeway employees who had been with the guard and a third Safeway employee who had been a possible witness to the escape of the suspects from the scene of the crime, appellant was placed under arrest. At this time he was again given his *Miranda* rights. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Appellant was then transported to the Robbery Branch office, where he was handcuffed to the desk in a large room with approximately 45 desks in it and left alone for 25 to 45 minutes while Detective Jefferson interviewed witnesses.

At about 1:30 a.m. Officer Jefferson returned to appellant, confronted him with the fact that the witnesses had incriminated him, and asked if he wanted to talk about the offense. There is some conflict in De-

tective Jefferson's testimony concerning whether he once again read appellant his rights before he took any statement from him, or whether he asked some questions before he repeated the *Miranda* warnings. In any event, the only answers appellant gave prior to the warnings were that he did not do it. At whatever point in time the warnings were given, Detective Jackson testified that he advised appellant of his rights and then told him:

. . . he didn't have to say nothing to me. I said that part on the rights card about, 'We'll get you a lawyer,' it's a farce, because we cannot get you a lawyer tonight. The best thing we can do is charge you and send you to the Cell Block. You don't have to say nothing.

Jefferson asked appellant if he understood what he had been told about his rights, and appellant responded "Yeah." Taylor then began to give a statement, which the officer took down in longhand.

Near the end of the interrogation, appellant's mother and Juvenile Officer Robert Blankenship arrived at the Robbery Squad office.[4] Officer Blankenship advised appellant Taylor of his *Miranda* rights and presented him with a police department card on which they were printed. With his mother's encouragement, appellant this time responded "No" to the questions: "Do you wish to answer any questions?" and "Are you willing to answer questions without having an attorney present?" Taylor's mother, who knew Detective Jefferson from a prior contact with her daughter, told appellant: "You don't have to answer no questions from nobody but Jeff, Detective Jeff [*sic*]."

After appellant's mother left, the typed statement was completed. Although Detec-

been shot and continue shooting from that position. Edwards died a few hours later.

**3.** Detective Pawlik read appellant his *Miranda* rights, (*Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)), and also added an example. In order to assure that the suspect understood how a statement could be used against him, Pawlik explained that if Taylor told the police that he was in Hawaii at the time of the offense, and it was later learned

that he had been in Mexico City, that statement could be brought before the court to show that he had lied.

**4.** Detective Jefferson testified at one point that they arrived when the questioning had been practically completed; later he said that they arrived after the longhand statement was completed but before appellant signed the typed copy.

tive Jefferson was aware of appellant's response to Officer Blankenship, he asked Taylor if he wanted to talk some more and presented him with the typed statement. The statement was on a standard police form which contains the *Miranda* rights in printed form on the top of the first page. Appellant read the statement and signed it. Detective Jefferson had no discussion with him concerning his previous response to Officer Blankenship that he did not want to answer questions without an attorney present.

Following a pretrial hearing, the court denied appellant's motion to suppress the statement. In a written order the judge found that:

> At no time did Taylor ask for a lawyer or verbally refuse to answer questions.
>
> . . .
>
> a. Taylor understood his *Miranda* rights and freely and voluntarily made his written statement.
>
> 1) Taylor was told of his rights three or four times. He stated that he understood his rights and had the assistance of a Youth Aid Officer and his mother in understanding these rights.
>
> 2) Taylor's statement was not the product of overreaching by the police or of any emotional impairment of his own capacities due to his concern for his friend.
>
> b. Taylor's indication that he did not want to answer questions reflected his mother's advice not his voluntary act.

A motion for reconsideration of this order was heard immediately before trial and denied.

## II

As this factual background indicates, appellant was a juvenile who had received full *Miranda* warnings on at least four occasion.[5] Nevertheless, appellant argues that his statement should have been suppressed because it was not freely and voluntarily made. In support of this contention, he points to two events: Detective Jefferson's comment during interrogation that an attorney could not be immediately provided when questioning occurred during the middle of the night; and the fact that appellant signed the confession for Detective Jefferson after his response to Officer Blankenship that he did *not* wish to answer questions without an attorney present.

▇ Initially it should be noted that the trial court's conclusion that the statement was voluntarily made will not be overturned unless it was without substantial support in the evidence. *See United States v. Lyon*, D.C.App., 348 A.2d 297, 299 (1975); *United States v. McNeil*, 140 U.S. App.D.C. 3, 6, 433 F.2d 1109, 1112 (1969). We conclude that the record in this case amply supports denial of appellant's suppression motion.[6]

▇ Under the circumstances of the instant case, we do not find Detective Jefferson's remark—that because an attorney was not immediately available in the middle of the night appellant must choose between talking to him or spending the night in the cell block—to have diluted the voluntariness of appellant's confession. We note

---

**5.** Appellant was read full *Miranda* rights when he was initially questioned by Officer Pawlik, again when he was placed under arrest, and again when he signed the rights card for Officer Blankenship. In addition the rights form appeared on the statement which he signed. Finally, Detective Jefferson had told appellant his rights either before or near the beginning of questioning at the police department.

**6.** Voluntariness of the waiver is determined in light of the totality of the particular circumstances involved in each case, *United States v. Lyon, supra* at 298–99, and must be proven by the prosecution by the preponderance of the evidence, *Lego v. Twomey*, 404 U.S. 477, 489,

92 S.Ct. 619, 30 L.Ed.2d 618 (1972); *Hawkins v. United States*, D.C.App., 304 A.2d 279, 282 (1973) (admitting appellant's statement while entertaining a reasonable doubt about voluntariness is harmless error). The totality of the circumstances test applies equally to ascertaining the voluntariness of a confession made by a juvenile. *In re J. T. F.*, D.C.App., 320 A.2d 322, 324–25 (1974). A defendant's age is one of the factors which should weigh heavily in a consideration of the circumstances. In this case, however, it is clear the trial court considered appellant's age, education, and emotional state at the time the statement was given.

that the Supreme Court in *Miranda* explicitly rejected the suggestion "that each police station must have a 'station house lawyer' present at all times to advise prisoners." 384 U.S. at 474, 86 S.Ct. at 1628. All that is required is that authorities provide counsel within a "reasonable period of time." *Id.* Although Detective Jefferson told appellant that a lawyer was not available that night, he twice emphasized that the suspect did not have to talk to him. The implication was clear that if appellant wished to wait until morning to talk, an attorney would be provided then. Because the police thus would have provided counsel within a reasonable period of time. Jefferson's explanation was not coercive; instead, it merely presented appellant with the realistic alternatives which he faced in the situation.

In analyzing appellant's refusal to answer questions for Officer Blankenship without an attorney present and his subsequent willingness to sign a statement for Detective Jefferson, appellant invites this court to "recognize an absolute ban on police initiated interrogation after an accused's assertion of his right to counsel" regardless of the voluntariness of a subsequent statement. (Appellant's Brief at 13.) For us to take such a position would be unsupported by controlling case law and unwise on the facts of the instant case.

■ The Supreme Court in *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), rejected the proposition that *Miranda* had "create[d] a *per se* proscription of any further interrogation once the person being questioned has indicated a desire to remain silent." *Id.* at 103 n.9, 96 S.Ct. at 326 (citing cases). Instead, the Court held that a defendant who had once decided to remain silent may be questioned subsequently if "his 'right to cut off questioning' was 'scrupulously honored.'" *Id.* at 104, 96 S.Ct. at 326, *citing Miranda, supra* at 474, 479, 86 S.Ct. 1602. Such a standard is clearly violated where questioning continues despite police awareness that a defendant desires the presence of an attorney, and this court has so held. *United States v. Lyon,*

*supra* at 299; *In re R.A.H.*, D.C.App., 314 A.2d 133, 134 (1974). The instant case is not, however, governed by these cases, for it is factually distinguishable.

Appellant here had been repeatedly given his *Miranda* rights, and the court found that at no time during the evening had he asked for a lawyer or orally refused to answer questions. The only point at which there was any ambiguity concerning the voluntariness of the confession arose when Taylor signed a card for Officer Blankenship on which he indicated an unwillingness to answer questions unless an attorney was present. Appellant had already given all or almost all of his statement to Jefferson when he indicated that he was unwilling to talk to Officer Blankenship without an attorney present. Appellant otherwise appeared to Detective Jefferson to be very willing to talk about the incident, as though "he wanted to get it off his chest." Appellant's response to Officer Blankenship should be viewed in light of his mother's advice that: "[y]ou don't have to answer no questions from nobody but Jeff, Detective Jeff [*sic*]." The situation thus indicates only a desire not to talk to a particular questioner rather than a genuine desire for counsel.

The case at bar is therefore analogous to *Brown v. United States*, D.C.App., 359 A.2d 600 (1976), in which the defendant gave an oral statement to one detective but then refused to answer any questions for a second detective, whom he did not like. The first detective, who was unaware of Brown's conversation with the second policeman, continued to question him and ultimately obtained a signed confession. This court found a knowing and intelligent waiver of appellant's constitutional rights, despite the request for counsel at one point in the evening. *Id.* at 602. *See also United States v. Calhoun*, D.C.App., 363 A.2d 277, 282–83 (1976). The only way in which the instant case differs from *Brown* is that here, Detective Jefferson was aware of appellant's request for an attorney when he was talking with Officer Blankenship. Jefferson's interpretation of that event, which

is consistent with the remarks of Taylor's mother, was that "[h]e didn't want to talk to them. He wanted to talk to me."

As we noted above, it is for the trial judge to evaluate equivocal acts in the context of relevant circumstances to determine whether they amount to an assertion of the right to silence or the right to counsel. On the record in this case, there was abundant support for the trial court's denial of appellant's suppression motion. *See United States v. Lyon, supra.*

### III

Appellant's second contention is that the trial court erred in declining to give a defense-requested instruction to the jury concerning defense of another. This court has said that an accused is entitled to a requested instruction "if there is 'any evidence fairly tending to bear upon the issue . . .', however weak." *Rhodes v. United States,* D.C.App., 354 A.2d 863, 864 (1976), *citing Belton v. United States,* 127 U.S.App.D.C. 201, 206, 382 F.2d 150, 155 (1967), *quoting Stevenson v. United States,* 162 U.S. 313, 315, 16 S.Ct. 839, 864, 40 L.Ed. 980 (1896).

In order to offer a viable defense based on defense of another, the intervenor must demonstrate that the third party was the innocent victim of an unlawful attack, *i. e.*, the intervenor must prove that the victim of the attack was himself entitled to the defense of self-defense. *Purdy v. United States,* D.C.App., 210 A.2d 1, 2 (1965); R. Perkins, Criminal Law 1019–21 (2d ed. 1969). This defense of self-defense is not available to an aggressor unless after instigating the attack, he has attempted in good faith to withdraw from the confrontation and has communicated this desire to his opponent. *United States v. Grover,* 158 U.S.App.D.C. 260, 262–63, 485 F.2d 1039, 1041–42 (1973).

Appellant here argues that there was sufficient evidence before the jury to require an instruction on defense of another, based on his trial testimony that while Edwards was struggling to remove a gun

from his pants, the security guard fired at him and continued to shoot even after Edwards had fallen to the ground. Appellant urges us to construe Edwards' collapse as a withdrawal on his part from his original attack on the guard, thereby transforming the guard into the aggressor and returning to the initiator of the conflict (Edwards) the right to use force in self-defense. Further, appellant offers his trial testimony that only after Edwards fell to the ground and was continuously fired upon did he (appellant Taylor) drawn his own gun and shoot at the guard.

Under the standards established in *Rhodes v. United States, supra,* and *Purdy v. United States, supra,* a defendant's testimony would be sufficient to support a requested instruction, even where it had been contradicted by prosecution witnesses, if the assertions contained in that testimony established the theory of defense which was advocated by defendant. When we evaluate the evidence in the instant case against the elements required in order to establish a viable defense based on defense of another, we must conclude, however, that there was no factual basis for such an instruction.

Appellant misconstrues the application of the legal theory of defense of another. At no time did appellant have the right to come to the defense of Edwards, for at no time was Edwards himself entitled to use deadly force against the security guard. Edwards initiated the conflict when he announced the robbery, and all three prosecution witnesses agreed that Edwards was the first to shoot. One who commits an armed robbery forfeits his right to claim the right of self-defense against either the intended victim of the robbery or any person intervening to prevent the crime. Annot., 55 A.L.R.3d 1000, 1019 (1974), *citing Gray v. State,* 463 P.2d 897 (Alaska 1970). Thus, because Edwards himself could not justifiably return the fire of a security guard who was attempting to prevent a felony and who had been fired on first, appellant likewise had no right to shoot.[7]

---

7. Even if we accept as true appellant's testimony that Edwards fell to the ground, the circum-

stances did not establish facts from which a jury could conclude that he had withdrawn

In addition, in a case such as this which involves the actions of a person who is authorized to prevent crime, *viz.*, the shopping mall guard, a bystander has no right to intervene in the officer's lawful discharge of his duties. *United States v. Davis*, 423 F.2d 974, 975 n.1 (5th Cir.), *cert. denied*, 400 U.S. 836, 91 S.Ct. 74, 27 L.Ed.2d 69 (1970); *State v. Madden*, 61 N.J. 377, 399–400, 294 A.2d 609, 621–22 (1972).

For the preceding reasons, we conclude that the trial court properly refused to instruct the jury concerning the defense of another.

*Affirmed.*

from the confrontation. To the contrary, available evidence supports the inference that Edwards continued to participate in the shoot-out. One Safeway employee testified that although he saw the gunman crouch over as though he had been hit, the robber continued to fire from that position. Appellant himself, when asked whether Edwards stopped firing when he went down, answered, "I don't remember." Thus, the facts do not establish a withdrawal by the person, *viz.*, Edwards, to whose defense appellant allegedly was coming.